UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JANET WHITEAKER,

                Plaintiff,                      Case No. 16-cv-13202
                                                  Hon. Mark A. Goldsmith

vs.

BANK OF AMERICA,

                Defendant.
_____/

**OPINION & ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 23)**

      This matter is before the Court on Defendant Bank of America's motion for summary judgment (Dkt. 23). Briefing on the motion is complete, and a hearing was held on November 9, 2017. For the reasons that follow, the Court grants Bank of America's motion.

**I. BACKGROUND**

      Plaintiff Janet Whiteaker was a personal banker at Bank of America from the time it acquired her previous employer LaSalle Bank in 2008 until she was terminated in April 2015 at the age of 59. Whiteaker Dep., Ex. A to Def. Mot., at 40 (Dkt. 23-2). Whiteaker was assigned to the Cass/Highland bank branch in late 2012. Warner Dep., Ex. D to Def. Mot., at 32 (Dkt. 23-7).

      In 2013, Bank of America overhauled its Sales Performance guidelines. In addition to quarterly goals – where personal bankers were assessed both objectively (a "what" rating) and subjectively (a "how" rating) and given a rating of "does not meet," "meets," or "exceeds," – personal bankers would now be responsible for monthly Key Performance Indicators ("KPI"). Chudik Decl., Ex. B to Def. Mot., ¶¶ 12-13 (Dkt. 23-4). KPI scores were rated as red, yellow, or

1

green, with red indicating a failure to meet expectations.  Id.  A monthly KPI score was determined by aggregating four individual factors – stair step widening, stair step movement,[1] sales interactions, and referrals.  See Chudik Supp. Decl., Ex. B. to Def. Reply, ¶¶ 4-5 (Dkt. 30-3); Personal Banker – Sales Performance Guidelines ("SPG"), Ex. A-8 to Def. Mot., at 12 (cm/ecf page) (Dkt. 23-3).  Under these new Sales Performance guidelines, discipline could be imposed either for a failure to meet the quarterly "what"/ "how" expectations, or for obtaining a monthly KPI score of "red."  Chudik Decl. ¶ 14.  Termination could result from as few as four such failures.  See SPG.[2]  The guidelines call for managers to speak to Advice and Counsel ("A&C"), a unit based out of Bank of America's headquarters in North Carolina that is comprised of human resource specialists, before issuing discipline.  Chudik Decl. ¶ 14.

In 2013, Whiteaker received a quarterly rating of "Does not meet" for her "What" category for both Q2 and Q3.  See Def. Mot., Ex. A-16, at 48-49 (cm/ecf page) (Dkt. 23-3). On November 11, 2013, Whiteaker's financial center manager, Jimmy Mehta, gave her verbal counseling.  See 1/29/2014 Written Warning – Failure to Meet Performance Expectations, Ex. A-19 to Def. Mot., at 58 (cm/ecf page) (Dkt. 23-3).

---

[1] The parties do not explain what "stair step movement" and "stair step widening" mean, although based on documents provided by Bank of America, it appears to be credit for expanding a client relationship.  A "2014 Personal Banker Incentive Fact Sheet" explains that revenue for stair step movement is "earned when a customer moves up to Stair Step 2 (i.e. achieving Primary status) or Stair Step 3 (i.e. moves up to Primary Plus Credit)."  Revenue for stair step widening is "earned when a sales event occurs and its quality definition is met – regardless of whether Stair Step movement occurred. (e.g. a Personal Banker sells a credit card and the customer uses it)."  Banking Center Channel Personal Banker Incentive Plan Manual, Ex. A-6 to Def. Mot., at 4 (cm/ecf page) (Dkt. 23-3).

[2] The four stages of recommended discipline are verbal counseling, written warning, final written warning, and potential termination.

Whiteaker also received a "does not meet" score in her "what" category for Q4 of 2013. Ex. A-16 to Def. Mot. at 50 (cm/ecf page) (Dkt. 23-3); Ex. 13 to Pl. Resp. (Dkt. 28-14). Her annual "what" rating for 2013 was "Does not meet." Id. On January 29, 2014, Bank of America's records reflect that Mehta gave Whiteaker a written warning for failure to meet her performance expectations, although the parties disagree about whether this, in fact, occurred. See 1/29/2014 Written Warning – Failure to Meet Performance Expectations, Ex. A-19 to Def. Mot., at 58 (cm/ecf page) (Dkt. 23-3); Whiteaker Dep. at 194-196. Mehta testified that he spoke to A&C before disciplining Whiteaker. Mehta Dep., Ex. H to Def. Mot., at 19 (Dkt. 23-11).

Whiteaker appeared to improve in early 2014, as she received quarterly scores of "meets" in both her "what" and "how" categories in Q1 of 2014. Ex. A-17 to Def. Mot., at 52 (cm/ecf page) (Dkt. 23-3); Ex. 17 to Pl. Resp. (Dkt. 28-18). In March 2014, she was ranked 79th out of 167 bankers in the region, according to a "Personal Banker Talent Analytics" chart. Personal Banker Talent Analytics, Ex. 7 to Pl. Resp. (Dkt. 28-8). However, in April 2014, she received a KPI score of red in all four categories. See 6/6/2014 Written Warning – Failure to Meet Performance Expectations, Ex. A-22 to Def. Mot., at 61 (cm/ecf page) (Dkt. 23-3). On June 6, 2014, Mehta gave Whiteaker a written warning, either for the first or second time. Id. The written warning stated that Whiteaker's KPI was red for all four categories for the month of April. Id. The written warning has a space designated for the employee's signature, in which "refused to sign" was written. Id. Whiteaker testified that Mehta had told her that he received an email and that he would be writing a warning, but that she did not actually receive the June 2014 written warning until September 2014. Whiteaker Dep. at 8-9.

On September 5, 2014, Heather Subran-Marsh, who became the Consumer Market Manager ("CMM") at Cass/Highland in July 2014, gave Whiteaker a final written warning.

9/5/2014 FINAL Written Warning – Performance, Ex. A-23 to Def. Mot., at 62 (cm/ecf page) (Dkt. 23-3).[3]  This warning notes that her KPI results were all yellow in 2013, and in 2014 she was red four months out of seven.  9/5/2014 FINAL Written Warning – Performance, Ex. A-23 to Def. Mot.  It further states that Whiteaker "ranked last in the market and red most recently in July for overall KPI Index."  Id.[4]  Whiteaker did sign this warning, and in the "Employee Comments" section, wrote, "[w]ant to note I disagree and will be presenting a rebuttal to be placed in my file w/ warning."  Id.

Whiteaker spoke with Subran-Marsh after receiving the final written warning, to see if she could possibly move to a branch that was "succeeding."  Whiteaker Dep. at 114.  Subran-Marsh asked if Whiteaker wanted to move to the Highland/Milford branch, and Whiteaker said that she would like to think about it.  Id.  At this point, Whiteaker and Subran-Marsh's accounts diverge:  Whiteaker maintains that she later told Subran-Marsh that she would prefer to stay at her current branch, because she did not think that she would be successful at Highland/Milford.  Id.  Subran-Marsh, however, testified that Whiteaker made it very clear to her that the Cass/Highland center was not working for her, and that the idea of a transfer to Highland/Milford came out of conversations she and Whiteaker had regarding Whiteaker's performance at Cass/Highland.

---

[3] Mehta was apparently out sick at this time.  Whiteaker Dep. at 9.  Whiteaker argues that Subran-Marsh ignored A&C's instruction to issue a written warning or final written warning only after meeting with her and obtaining her explanation.  Pl. Resp. at 2.  The notes from A&C state, "Adv WW or FWW for sales performance based on obtaining EE's [employee's] explanation."  Ex. 10 to Pl. Resp. at 9 (cm/ecf page) (Dkt. 28-11).

[4] Whiteaker argues that she could not have been last in the market because another personal banker, Jeannine Liranzo, performed more poorly than Whiteaker.  However, in her deposition, Whiteaker agreed that the statement was accurate.  See Whiteaker Dep. at 207 ("Then it says, you were ranked last in the market and red most recently in July for overall KPI Index.  Is that accurate?" "Yes.").  Additionally, as discussed further below, Liranzo was in her "ramp-up" period until September 2014.

Subran-Marsh Dep., Ex. E to Def. Mot., at 32-33, 40 (Dkt. 23-8). She maintains that Whiteaker ultimately asked for a reassignment on September 5, 2014 – the day Subran-Marsh administered the Final Written Warning – and she did not recall Whiteaker telling her a week later that she did not want to go to Highland/Milford. Subran-Marsh Decl., Ex. F to Def. Mot., ¶¶ 5, 7 (Dkt. 23-9).

On September 10, 2014, Whiteaker wrote a rebuttal to her final written warning. J.R. Whiteaker Response to Final Written Warning – Performance, Ex. E-12 to Def. Mot. (Dkt. 23-8). Whiteaker wrote that in the September meeting, Subran-Marsh had referred to two written warnings (from January and June 2014) but that Whiteaker "was never presented with a written or verbal warning in June 2014." Id. She further wrote that she was presented with a copy of the January 2014 written warning, but was advised that she did not need to sign it. Id. Whiteaker denied that she was failing to meet performance expectations; she also said that Subran-Marsh did not have an accurate impression of Whiteaker's performance, because Subran-Marsh had only been the CMM for two months and was "rarely present" at the Cass/Highland branch. Id. Whiteaker also wrote that she believed her transfer in December 2012 "to a branch that could not support two personal bankers . . . was the first step in a strategy to terminate my employment because of my age." Id. At some point after September 10, 2014, Subran-Marsh and Whiteaker discussed the rebuttal letter; Subran-Marsh denied that Bank of America was treating Whiteaker unfairly due to her age. Whiteaker Dep. at 259-260.

On October 18, 2014, Whiteaker was reassigned to the Highland/Milford center. Whiteaker Dep. at 67. Whiteaker was the only personal banker at the Highland/Milford location, id., and her job title, responsibilities, pay, and benefits remained the same, Gardner-Turner Decl., Ex. I to Def. Mot., ¶ 4 (Dkt. 23-12). Her new financial center manager was Lori Rea. Whiteaker Dep. at 67.

In November 2014, Whiteaker's KPI was trending red.  See Chudik Decl. ¶ 17.  Subran-Marsh instructed Rea to call A&C regarding providing Whiteaker with a final written warning. Rea Dep., Ex. C. to Def. Mot., at 70-73 (Dkt. 23-6); Ex. 10 to Pl. Resp., at 7-8 (cm/ecf page) (Dkt. 28-11).  Rea called A&C on November 21; both Rea and A&C opposed issuing a final written warning at that point.  Id.  Three days later, Subran-Marsh called A&C to confirm that they had advised Rea not to issue disciplinary action until the end of Q4.  Ex. 10 to Pl. Resp., at 7 (cm/ecf page).  A&C confirmed that this was correct, and advised Subran-Marsh that Whiteaker "needs an opportunity to be coached and improve[.]"  Id.

On February 27, 2015, after consulting with A&C,[5] Rea gave Whiteaker her second final written warning.  See 2/26/2015 FINAL Written Warning Restated – Performance, Ex. A-24 to Def. Mot. (Dkt. 23-3); Rea Dep. at 98.  The warning stated that her KPI performances in April, May, July, and November 2014 and January 2015 were red, which amounted to five out of the last twelve months.  Ex. A-24 to Def. Mot.  Whiteaker signed the form and commented that she would provide a response in writing.  Id.

On February 28, 2015, Whiteaker provided a written response to her final written warning. J.R. Whiteaker Response to Final Written Warning Restated – Performance, Ex. E-16 to Def. Mot. (Dkt. 23-8).  Whiteaker wrote that she had more competition at the Highland/Milford branch than she had had previously, as there was an employee there who performed similar functions to Whiteaker.  Id.  She also noted that she needed to develop a customer base in the new location.  Id.

---

[5] See Def. Mot., Ex. G-2, Inquiry Notes Report (Dkt. 23-10) (showing that Rea called A&C on February 26, 2015 regarding Whiteaker's performance and reflecting that Whiteaker "[i]sn't aggressive and doesn't accept coaching on how to position questions to the customer . . . [and] doesn't ask for the business").

The response itself does not mention age discrimination, though Whiteaker wrote that she incorporated her September 2014 written response into her February 2015 response. Id.

In Q1 2015, Whiteaker's "what" score was "does not meet." Her overall KPI was red for January, February, and March 2015, and trending red for April 2015. Chudik Decl. ¶ 17.[6] On April 22, 2015, Subran-Marsh contacted A&C regarding Whiteaker's performance. Inquiry Notes Report, Ex. G-3 to Def. Mot. (Dkt. 23-10). A&C advisor Dayna Walters advised Subran-Marsh that she could terminate Whiteaker. Id.; Walters Decl., Ex. G to Def. Mot., ¶ 8 (Dkt. 23-10). On April 24, 2015, Subran-Marsh terminated Whiteaker. Rea testified that she did not feel comfortable doing so herself, so Subran-Marsh drove 45 minutes to terminate Whiteaker. Rea Dep., Ex. 3 to Pl. Resp., at 80.[7]

Whiteaker filed a complaint against Bank of America on September 6, 2016, alleging the following claims: (i) discriminatory treatment in violation of the Age Discrimination Employment

---

[6] Whiteaker denies this, stating that she "exceeded her January 2015 goals by 100.29%." Pl. Resp. ¶ 27; p. 15. She cites to a "Consumer Banking Seller Dashboard and Funding Summary" from Q1 2015, which shows that she achieved 100.29% of her goal for January 2015. Ex. 14 to Pl. Resp. at 2 (cm/ecf page) (Dkt. 28-15). However, in her deposition Whiteaker agreed that her KPI results were red in January and February 2015; that she did not have any reason to believe that she was not red in March of 2015; and that she was trending red in April 2015. Whiteaker Dep. at 213-214. Further, a March 1, 2015 note on Whiteaker's performance assessment states, "Although Jan had a better January the performance slip for Feb & March. Jan was also Red in Partner for all 3 months." Chudik Decl., Ex. 6 (Dkt. 23-5). The discrepancy here appears to be caused by the fact that the "Seller Dashboard" that Whiteaker cites shows only two of the four scores that make up an overall monthly KPI. See Def. Reply ¶ 2 ("But those documents [the dashboards] only show two KPI factors."); Chudik Supp. Decl. ¶ 6 ("In January 2015 . . . [Whiteaker's] Stair Step Widening result was 'green,' but her other three individual KPIs were 'red.'"). Thus, Whiteaker received a 100.29% on her "Dashboard" for January, but received a red KPI overall.

[7] Whiteaker alleges that "Mehta would not have recommended Whiteaker's termination." Pl. Resp. ¶ 25. However, his deposition testimony was that he "would not have recommended the termination of Ms. Whiteaker during the time that she worked under [him] as a personal banker." Mehta Dep. at 32. He did not say whether he would have terminated her in April 2015, after several more months of poor performance.

Act of 1967 ("ADEA"); (ii) retaliatory conduct in violation of the ADEA; (iii) age discrimination in violation of the Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 et seq. ("ELCRA"); and (iv) retaliatory conduct in violation of the ELCRA.  Bank of America now moves for summary judgment on all claims.

## II. STANDARD OF REVIEW

On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. ANALYSIS

### A.  Age Discrimination Claims

Under both the ADEA and the ELCRA,[8] a plaintiff may establish a claim for age discrimination by offering either direct or circumstantial evidence of the discrimination.  Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003).   Direct evidence is evidence "which, if believed, requires the conclusion that unlawful discrimination was a least a motivating factor in the employer's actions."  Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999).  Circumstantial evidence is "proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."  Wexler, 317 F.3d at 570.  Whiteaker does not argue that there is direct evidence of discrimination, so the Court will proceed under a circumstantial evidence framework.

---

[8] "ELCRA claims are analyzed under the same standards as federal ADEA claims."  Geiger v. Tower Auto, 579 F.3d 614, 626 (6th Cir. 2009).

"Under the circumstantial evidence framework, the plaintiff first has the burden of proving a prima facie case of discrimination; if she is successful, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions; if the defendant articulates a non-discriminatory reason, the plaintiff has the opportunity to prove that the proffered reason is pretextual." Shrivastava v. RBS Citizens Bank, N.A., 227 F. Supp. 3d 824, 833 (E.D. Mich. 2017) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–805, (1973); Geiger v. Tower Auto., 579 F.3d 614, 622 (6th Cir. 2009) (applying McDonnell Douglas to circumstantial-evidence claims in ADEA and ELCRA cases)). To make out a prima facie case of discrimination, a plaintiff must establish that "(i) she is a member of the protected class; (ii) she was qualified for her job and performed it satisfactorily; (iii) she suffered an adverse employment action; and (iv) she was replaced or treated less favorably than a similarly situated person outside her protected class." Id. The parties appear to agree that Whiteaker has put forth a prima facie case, and they do not debate whether Bank of America has articulated a non-discriminatory reason for its actions. Instead, the parties focus on whether Whiteaker has established that Bank of America's proffered reason for Whiteaker's termination is a pretext.

A plaintiff may prove pretext in one of three ways: "(1) by showing that the stated reasons had no basis in fact, (2) by showing that they were not the actual reasons, [i.e., that they did not actually motivate the defendant's challenged conduct] and (3) by showing that they were insufficient to explain the discharge." Wheeler v. McKinley Enterprises, 937 F.2d 1158, 1162 (6th Cir. 1991). Whiteaker relies on the last two reasons – that Bank of America's explanations of Whiteaker's allegedly poor performance did not actually motivate her firing; and that these explanations were insufficient to explain her termination. Pl. Resp. at 19.

### 1. Whiteaker cannot show that age was the actual motivation for her termination

Under the second prong, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds). The plaintiff must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." Jones v. St. Jude Medical S.C., Inc., 504 F. App'x 473, 477 (6th Cir. 2012) (quoting Braithwaite v. Timken Co., 258 F.3d 488, 494 (6th Cir. 2001)).

Whiteaker raises a number of arguments that she claims show pretext. First, she points to several facts that amount to disagreement with Bank of America's policies and procedures. Whiteaker notes that Subran-Marsh "went out of the chain of command" to issue Whiteaker's Final Written Warning in September 2014, after only having been Whiteaker's boss's boss for a month. Pl. Resp. at 19 (Dkt. 28). However, Whiteaker has acknowledged that Mehta was out sick at the time; she also does not dispute that her conduct merited discipline under Bank of America's guidelines. See Whiteaker Dep. at 205-207. She does not argue that, as her boss's boss, Subran-Marsh was prohibited from disciplining Whiteaker (whether in Mehta's absence or otherwise). Whiteaker also expresses frustration with the system of goals for personal bankers, noting that "[t]he Highland Milford branch consistently struggled with its goals" and "historically struggled more than usual in the first quarter because of the high number of 'snow bird' customers." Pl. Resp. at 20. She also notes that Subran-Marsh issued her a second Final Written Warning in February 2015, "after the preceding positive quarter and month." Id. This amounts to a disagreement with the goals that Bank of America set for a specific branch, and a disagreement that she could be disciplined for prior poor performance when her immediately preceding quarter was positive. But all of these are essentially complaints about the way that Bank of America runs

its business, and "a plaintiff cannot show pretext by raising questions about the soundness of the employer's business judgment." Degrazia v. Ermanco, Inc., 961 F.2d 1576, 1992 WL 88864, at *2 (6th Cir. May 1, 1992).

Whiteaker also claims that Subran-Marsh orchestrated a "swap" of her and personal banker Jeannine Liranzo – when Whiteaker was transferred from Cass/Highland to Highland/Milford and Liranzo was sent from Highland/Milford to Cass/Highland – in order to "save" Liranzo from a written warning and to place Whiteaker at a bank where she would fail to meet her goals. Pl. Resp. at 20. She offers no proof that Subran-Marsh tried to "save" Liranzo. The evidence shows the opposite – Subran-Marsh had contacted A&C regarding a possible demotion for Liranzo, and told Rea that she supported giving Liranzo a written warning in the fall of 2014. See Inquiry Notes, Ex. G-4 to Def. Mot., at 31 (cm/ecf page) (Dkt. 23-10).

Nor does Whiteaker offer evidence to support her theory that Bank of America "systematically placed older bankers at the Highland Milford branch, and used Rea as an instrument to manage them out." Pl. Resp. at 20-21. She cites to "Rea notes and chart," which appear to be handwritten notes taken by Lori Rea and a list of names. See Pl. Ex. 9 (Dkt. 10). But Whiteaker fails to provide any further information about these notes or the list of names – presumably, the names refer to older employees that were "manage[d] . . . out," but there is no information regarding whether all of these employees were transferred to the Highland/Milford branch and subsequently terminated (the notes appear to say, "at one branch?" in the corner); the circumstances of their employment or termination; nor any context to what appears to simply be a handwritten list of names. Meanwhile, other evidence contradicts Whiteaker's claim that older bankers were systematically sent to Highland/Milford – the banker who immediately preceded Whiteaker at Highland/Milford was Liranzo, and the banker who immediately succeeded her was

Sean Yesko, both of whom were younger than Whiteaker. As discussed supra, Whiteaker's entire claim rests on the fact that they are younger bankers.

Whiteaker next contends that Subran-Marsh also intervened to help another younger employee, Jackie Johnson – a teller who wanted a promotion to assistant manager. See Pl. Resp. at 14. Even though Johnson failed the test, Subran-Marsh informed her that there were "ways around" that, and Johnson was still promoted to the assistant manager position. See id. But the fact that Subran-Marsh once helped a young employee – in a different position than Whiteaker – does not show that age discrimination is a more likely motivation for Whiteaker's firing than her performance record.

Finally, Whiteaker claims that Subran-Marsh "decimat[ed] the staffing at the [Highland/Milford] branch" and gave Rea a "does not meet" score in January 2015 in an effort to terminate the 57 year-old Rea, which shows a pattern or practice of age discrimination by Subran-Marsh. Pl. Resp. at 21.[9] She argues that Johnson's promotion left the Highland/Milford branch without a teller during the holiday season, which negatively impacted the branch. Id. at 14. In addition to Johnson's promotion, Whiteaker alleges that Subran-Marsh transferred another teller away from Highland/Milford in September 2014. Id. at 14. But Whiteaker points to no evidence that Subran-Marsh orchestrated either of these events to "decimat[e]" the staffing at Highland/Milford. There is no indication that Subran-Marsh intentionally delayed in finding a

_____

[9] Whiteaker simply states that "pattern or practice evidence may be relevant to proving an otherwise-viable individual claim for disparate treatment under the McDonnell Douglas framework," quoting Bacon v. Honda, 370 F.3d 565, 575 (6th Cir. 2004). Pl. Resp. at 21. She does not develop this argument at all, other than to state that Subran-Marsh's alleged treatment of Rea, as described above, shows a pattern or practice of discrimination. As stated in Bacon, the pattern or practice evidence may be relevant to an otherwise viable claim, which Whiteaker does not have. Finally, Whiteaker's evidence does not show a pattern or practice of age discrimination, as discussed supra.

replacement teller for the Highland/Milford branch after Johnson was promoted; Subran-Marsh stated that Johnson was replaced only a few weeks later. Subran-Marsh Supp. Decl., Ex. F to Def. Reply, ¶ 4 (Dkt. 30-7). And Whiteaker cites to Rea's testimony to support her claim that Subran-Marsh transferred a teller away in September 2014, but Rea had testified, "I had a teller leave me in September and I never got a replacement for her, and I kept being told I'm getting a replacement." Rea Dep. at 27. Subran-Marsh stated that the teller quit her job, and gave the reason as a "career change." Subran-Marsh Supp. Decl. ¶ 3. There is no indication that Subran-Marsh was "decimating" the staffing at Highland/Milford. And the fact that Subran-Marsh gave Rea a "does not meet" score, without any additional information regarding Rea's performance, does not prove anything.

Overall, the facts do not show that "an illegal motivation was <u>more</u> likely than that offered by" Bank of America. It is clear that Whiteaker was a poor performer, and her allegations of Subran-Marsh's alleged "campaign to terminate Whiteaker" lacks any sort of factual support. If anything, it may be true that Subran-Marsh did not like Whiteaker – Whiteaker alleges that Subran-Marsh would "sit and stare at [her], saying nothing to her," <u>see</u> Rea Dep. at 75-76, 138, and referred to her as "Janet" when everyone else called her "Jan," <u>see</u> Whiteaker Dep. at 167; Rea Dep. at 75.[10] But there is nothing in the record to suggest that the termination was due to Whiteaker's age,

---

[10] Whiteaker does allege that Subran-Marsh once referred to her as "old-school." Whiteaker Dep. at 164-165. However, "old school" "is generally understood to refer to someone who does things in a traditional, perhaps outdated, way." <u>Gilster v. Humana, Inc.</u>, No. 14-961, 2016 WL 223582, at *5 (S.D. Ohio Jan. 19, 2016) (citing Webster's Ninth New Collegiate Dictionary). Whiteaker's testimony seems to confirm this understanding: "[Subran-Marsh] said to me that I was old school and I did not know how to sell. . . . She said I just couldn't sell. I was old school. I was unable to sell the bank products anymore. . . . She said I'm an order taker, I was just doing whatever the customer wanted and not looking for the sales." Whiteaker Dep. at 161, 164-165. Comments from Rea and Mehta also confirm that this was Whiteaker's style: A&C notes from a conversation with Rea reflect that Whiteaker "[i]sn't aggressive and doesn't accept coaching on how to position

rather than her consistently poor performance for an extended period of time. Whiteaker fails to meet her burden as to pretext under this prong.

### 2. Whiteaker cannot show that Bank of America's explanations were insufficient to explain her discharge

The third manner of proving pretext – showing that the defendant's stated reasons for termination were insufficient to explain the discharge – "ordinarily[] consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." Manzer, 29 F.3d at 1084. Whiteaker argues that the evidence shows that Sean Yesko and Jeannine Liranzo, younger personal bankers, performed comparable to or worse than she did, and were not terminated. Pl. Resp. at 22.

As an initial matter, the parties dispute the length and nature of a "ramp-up" period at Bank of America. Whiteaker argues that a ramp-up period – that is, a period of time when employees are not disciplined for a failure to meet their goals – was only three months. See Pl. Resp. ¶ 29. Bank of America responds that the ramp-up period was actually six months. See Def. Mot. ¶ 29. Bank of America points to ample evidence in the record to support its claim. See, e.g., SPG at 52 (cm/ecf page) (Dkt. 23-2) ("First FULL QTR after 6 months in role is the initial quarter that will be assessed as part of the SPG"; "Red in KPI Index: First month after 6 months in role is the initial

---

questions to the customer," and "doesn't ask for the business," Ex. G-2 to Def. Mot. at 18 (cm/ecf page) (Dkt. 23-10); Mehta stated in Whiteaker's Q2 2013 review that "[c]onsistency with aggressive sales" would help Whiteaker, and later stated that she "[n]eeds to ensure being consistent and proactive with every interaction," Ex. A-16 to Def. Mot. at 48, 50 (cm/ecf page) (Dkt. 23-3). In this context, the Court does not find that Subran-Marsh's comment that Whiteaker was "old school" circumstantially suggests that the reason for her termination was due to her age.

month that will be assessed as part of the SPG"); Chudik Decl. ¶ 18 ("Personal Banker Sean Yesko [who was hired on September 3, 2014] was in his ramp-up period until April 2015.").

To support her claim, Whiteaker cites to Lori Rea's deposition testimony. Rea testified that a ramp-up period might be three months, but "[m]aybe it's six," then later stated, "I believe it's six from the date of hire, because you have – you are in training for a couple of months. So I believe it's six." Rea Dep. at 17. Whiteaker also points out that Sean Yesko was disciplined after working at Bank of America for less than six months. However, Yesko's record reflects that this was a mistake – notes from A&C in May 2015 reflect that A&C informed Yesko's CMM that he should not have been given disciplinary action for January, February, or March of 2015 as he "was not in role for 6 months until 3/3/2015[.]" Inquiry Notes Report, Ex. A-1 to Def. Reply, at 8 (cm/ecf page) (Dkt. 30-2). Lastly, Whiteaker points out that Liranzo's "dashboard" shows that she did not have a goal in April 2014 – her third month of employment – but did have goals for the following months. Pl. Resp. at 11. This fact, however, says nothing about whether Liranzo was eligible for punishment for a failure to meet these goals, and Bank of America has put forth evidence that she was not. In light of all of the evidence put forth by Bank of America, and Whiteaker's failure to contradict it, it is clear that a ramp-up period at Bank of America was six months.

Whiteaker also argued at the hearing that she was not given the benefit of a ramp-up period when she was transferred to the Highland/Milford location. She pointed out that the A&C notes regarding Yesko's ramp-up period refer to his time in a "role," rather than being a newly hired employee; she thus concludes that she was in a new role in the new bank location and entitled to a ramp-up period. There is no merit to this argument. There is no reason to believe that an employee receives a new ramp-up period when moving to the same position in a new location. Yesko and

15

Liranzo were both re-assigned to new locations, and Whiteaker points to no evidence that either of them received a <u>new</u> ramp-up period upon their transfer.

The Court now turns to Yesko and Liranzo's performance and corresponding treatment by Bank of America. The evidence is clear that Yesko performed much better than Whiteaker.[11] The first month in which he was eligible to be disciplined for a failure to meet his goals was April 2015. Chudik Decl. ¶ 18. He received a yellow KPI score that month, and green for the next two months. <u>Id.</u> When he received a red KPI score in July 2015, he was disciplined. <u>See</u> Def. Mot., Ex. I-4. If anything, Bank of America treated Yesko worse than Whiteaker, as he received a Written Warning for his July 2015 violation – the second step in the disciplinary process. He <u>should</u> have received a Verbal Warning, the first step in the disciplinary process, because his Verbal Warning in April 2015 (regarding his February 2015 KPI scores) was in error. <u>See</u> Def. Reply, Ex. A-1, Inquiry Notes Report (May 12, 2015 entry states, "Adv[ised] CMM EE [employee] should not have been given DA [disciplinary action] for Jan, Feb, March as EE was not in role for 6 months until 3/3/2015").

---

[11] Whiteaker claims that Bank of America "has falsely portrayed Whiteaker's, Liranzo's, and Yesko's records." Pl. Resp. at 21. However, Bank of America contends that the documents Whiteaker relies on for her and Liranzo's records – the "Dashboards" – show an incomplete picture of an employee's performance. Chudik's declaration, where he states that his summary of the KPI results for Whiteaker, Liranzo, and Yesko was taken from Bank of America's computer database, is supported by various documents. For example, his declaration states that Whiteaker received red overall KPI scores in April, May, July, and November 2014 and January 2015, <u>see</u> Chudik Decl. ¶ 17; this is supported by Whiteaker's Final Written Warning in February 2015, which states the same thing, <u>see</u> Ex. A-24 to Def. Mot. In light of Bank of America's explanation, Whiteaker does not have any evidence to support her theory that Bank of America is lying. "When it is not supported by evidence, such a denial does not create a genuine issue of material fact as to whether Defendants' reasons for terminating [plaintiff] were pretextual." <u>Shrivastava</u>, 227 F. Supp. 3d at 839.

Whiteaker has a stronger argument with respect to Liranzo, but it too ultimately fails. Liranzo was in her ramp-up period until September 2014, but then received consecutive "red" overall KPI scores in September and October.  Chudik Decl. ¶ 19.  She received "red" overall KPI scores in December 2014; and February, March, and April 2015.  Id.  Liranzo had received prior disciplinary action related to her attitude and dress code.  See Ex. I-3 to Def. Mot., 5/30/2014 Written Warning – Failure to Meet Performance Expectations (Dkt. 23-12).  However, she was not disciplined for her sales performance until April 24, 2015.  See Ex. I-3 to Def. Mot., 4/24/2015 Written Warning - Failure to Meet Performance Expectations ("Your KPI began being tracked in August 2014.  Since that time your KPI results have been red for the months of AUG, SEP, OCT and DEC of 2014.  Also FEB and MAR of 2015.").

However, the evidence does not show that Liranzo was not disciplined for performance comparable to Whiteaker's.  It is true that she received red KPI scores for five of the seven months preceding her written warning.  But in comparing Whiteaker's KPI scores and corresponding discipline, it is clear that there is no precise science to when discipline is administered.  For example, in June 2014 Whiteaker received a written warning, which stated it was for receiving a "red" KPI score in April 2014, but at that point she had received red KPIs in three of the last five months.  When she received her second final written warning, Whiteaker had obtained red KPI scores in two of the last five months.  An employee was not always immediately reprimanded for receiving a red KPI.  Additionally, Liranzo received a green KPI in November 2014, something that Whiteaker never obtained.  It is difficult to know how this affects considerations of an employee's performance.  Further, some of Whiteaker's discipline was due to her quarterly results; the evidence does not reflect Liranzo's quarterly results.  And finally, Whiteaker's poor performance lasted nearly two years – from April 2013 (the start of Q2 for 2013, where she earned

a "does not meet" for her "what" rating) until her termination in April 2015. Liranzo's period of poor performance lasted from September 2014 until her resignation in May 2015 – a period of only nine months. Whiteaker cannot claim that the Bank's treatment of Liranzo raises a question of fact regarding pretext when she herself was given a longer period of time to try to improve than Liranzo.

Whiteaker's arguments that Subran-Marsh tried to "save" Liranzo are unsupported by the evidence; rather, the evidence suggests the opposite. On September 5, 2014, Subran-Marsh called A&C regarding Liranzo. See Inquiry Notes, Ex. G-4 to Def. Mot., at 31 (cm/ecf page) (Dkt. 23-10). The notes from the call reflect that Subran-Marsh wanted to discuss demoting Liranzo, as she had been hearing that Liranzo had behavior/performance issues. Id. at 32 (cm/ecf page). A&C said they would not advise demotion, as the behavior issues would be the same in a new role. Id. In October 2014, Rea called A&C regarding Liranzo's behavior issues, and stated that Subran-March wanted to move to a final written warning with Liranzo. Id. at 31 (cm/ecf page). And while Whiteaker alleges that the October 2014 swap "with Liranzo moving to the more successful Cass Highland location and Whiteaker moved to the desperately struggling Highland Milford branch was designed to protect Liranzo and hurt Whiteaker," Pl. Resp. at 13, she offers no proof of this. She argues that Subran-Marsh transferred Liranzo before Rea could administer the written warning, id., but as just discussed, Subran-Marsh had indicated to Rea that she supported issuing a written warning for Liranzo. Whiteaker claims that Subran-Marsh stepped outside of the chain of command to issue the September 2014 warning to Whiteaker, id., but Whiteaker admitted that Mehta was out on medical leave at the time, Whiteaker Dep. at 9-10.

Whiteaker also claims that Subran-Marsh changed Liranzo's Q3 evaluation from a "does not meet" to a "meets," which shows that Subran-Marsh was promoting younger bankers such as

Liranzo at Whiteaker's expense.  Pl. Resp. at 11.  But Liranzo was still in her ramp-up period during Q3 of 2014, and thus would not have been eligible for discipline regardless of whether her score was changed.  It is, therefore, not "evidence that . . . [Liranzo was] not fired even though [she] engaged in substantially identical conduct to that which [Bank of America] contends motivated its discharge of [Whiteaker]."  Manzer, 29 F.3d at 1084.

Whiteaker also argues more generally that if Bank of America held all of its bankers to the standards it held her, it would have fired more than half of its bankers.  Pl. Resp. at 19.  She contends that she was "a solid, 'meets expectations' performer."  Id.  In support, she cites a document which she claims shows that "[i]n 2013, she along with 106 other bankers were ranked yellow. . . . The norm was yellow."  Id.  However, the document is clearly labeled "July 2013" and is therefore a much smaller snapshot of Whiteaker's relative performance than she claims.  Further, Whiteaker's performance deteriorated in the months following July 2013.  At that point, she had not yet received even verbal counseling; she would go on to receive many more "red" KPI monthly scores and "does not meet" quarterly scores.

Accordingly, the Court concludes that Whiteaker has not met her burden of showing that Bank of America's reasons for her termination were pretextual.  Summary judgment is granted on the ADEA and ELCRA age discrimination claims.

## B.  Retaliation Claims

Whiteaker also brings claims for retaliation under both the ADEA and ELCRA.  The McDonnell Douglas framework also governs claims of retaliation based on circumstantial evidence.  To establish a prima facie case of retaliation, a plaintiff must show "(1) that the plaintiff engaged in a protected activity; (2) that the defendant had knowledge of the plaintiff's protected conduct; (3) that the defendant took an adverse employment action towards the plaintiff; and (4)

that there was a causal connection between the protected activity and the adverse employment action." Weigel v. Baptist Hosp. of E. Tenn., 302 F.3d 367, 381 (6th Cir. 2002). "Specifically, 'but for' causation between the protected activity and the adverse employment action is needed." Beard v. AAA of Mich., 593 F. App'x 447, 451 (6th Cir. 2014) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013)).[12] A retaliation claim based on ELCRA also "requires showing that the plaintiff's protected activity was a 'significant factor' in the employer's adverse action[.]" Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 527 (6th Cir. 2008).[13] "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007).

The parties do not dispute that Whiteaker's September 10, 2014 letter alleging that she had been discriminated against on the basis of her age constitutes protected activity. However, the analysis diverges here depending on whether the adverse action was Whiteaker's transfer to Highland/Milford in October 2014, or whether it was her termination in April 2015. The Court will address each in turn.

### 1. Transfer to Highland/Milford

---

[12] Although Beard involved a Title VII retaliation claim, the Sixth Circuit has "explained that Title VII's anti-retaliation provision is similar in relevant respects to the ADEA's anti-retaliation provision, and that it is therefore appropriate to look to cases construing Title VII as a source of authority for interpreting the ADEA's anti-retaliation clause." Fox v. Eagle Distributing Co., Inc., 510 F.3d 587, 591 (6th Cir. 2007).

[13] The Sixth Circuit rejected an argument that the "but-for" causation standard should not be used to assess a state law ELCRA claim. Beard, 593 F. App'x at 452 ("[T]he Supreme Court read 'but for' causation into Title VII guided largely by the ordinary meaning of the word 'because.' It stands to reason that Michigan courts would make the same interpretation of the identical 'because' language found in ELCRA.").

The Court concludes that Whiteaker fails to establish a prima facie case of retaliation with respect to her transfer to Highland/Milford because she cannot show that the reassignment constituted an adverse employment action. "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999). Whiteaker admits that she experienced no change in her title or salary, but contends that there are "other indices" that demonstrate that her reassignment to Highland/Milford was an adverse employment action. Pl. Resp. at 22.

Specifically, Whiteaker alleges that her "ability to succeed in the new position" changed when she was reassigned, and suggests that she was set up to fail.[14] Pl. Resp. at 22-23. Whiteaker's argument that Highland/Milford was a place where older bankers were sent to "wither and die" seems primarily based on her and Lori Rea's conclusions about a personal banker named Sandra Ward. However, Whiteaker admitted in her deposition that she had not seen any reports concerning Sandra Ward's performance, had never spoken to Sandra Ward, and "[t]he only thing [she had] on Sandra Ward would be from Lori Rae [sic] when she said that she believed Sandra Ward was also looking at counsel for being let go wrongfully." Whiteaker Dep. at 97-98. Whiteaker also offers no explanation for the fact that Liranzo and Yesko – both of whom are

---

[14] Although the parties dispute whether Whiteaker requested to be transferred, that fact is immaterial for purposes of determining an adverse employment condition. See Akers v. Alvey, 338 F.3d 491, 498 (6th Cir. 2003) ("Even assuming that Akers was involuntarily transferred to the Hardin County office, as she alleges, she failed to demonstrate how this transfer was materially adverse to her."); see also Sturdivant v. Geren, 2009 WL 4030738, at *7 (E.D. Va. Nov. 19, 2009) ("When courts have addressed the issue of involuntary transfer in the retaliation context, they have [] held . . . that such reassignment did not constitute an adverse employment action.").

employees in their twenties – were both assigned to Highland/Milford.  Additionally, Whiteaker's argument that bankers were unable to succeed at Highland/Milford is undercut by the fact that Yesko received "green" KPIs in May and June 2015.  <u>See</u> Chudik Decl. ¶ 18.  Whiteaker claims that this was because Highland/Milford was "historically . . . profitable" at this time, Pl. Resp. at 20, but Rea testified that the goals for personal bankers in the winter months were lowered in order to account for a historically less-profitable time of year, Rea Dep. at 136-137.

Accordingly, Whiteaker has not met her burden of establishing an adverse employment action with respect to the transfer.  The Court, therefore, concludes that, as a matter of law, she cannot succeed on a claim for retaliation based on her transfer to the Highland/Milford banking center.

### 2. Termination

With respect to the termination, the only element of the prima facie case at issue is causation.  Whiteaker argues that the temporal proximity, along with the other evidence of retaliatory conduct, is sufficient to establish the causal connection. Pl. Resp. at 24.  She notes that seven months passed between her first complaint and her termination, and only six weeks passed between her second complaint and termination.  <u>Id.</u>  Bank of America argues that the second letter says nothing about age discrimination on its face – only that it incorporates the first letter – and Whiteaker has failed to show that (i) this makes sending the second letter a protected activity; or (ii) that Subran-Marsh would have appreciated the second letter as raising another claim of age discrimination.  Def. Reply at 14.  With respect to the first letter, Bank of America argues that seven months is too long of a period to give rise to an inference of causation under state or federal law.  Def. Mot. at 23.

Generally, "temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."  Tuttle v. Metropolitan Gov't of Nashville, 474 F.3d 307, 321 (6th Cir. 2007).  Temporal proximity alone is sufficient only in a narrow set of cases, as the Sixth Circuit has explained:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

Mickey, 516 F.3d at 525.  Therefore, the issue of whether the Court considers the second letter to constitute protected activity affects what showing Whiteaker must make to establish causation.  A time period of two months between the protected activity and the adverse employment action may be enough to establish causation on its own, but the seven months between Whiteaker's first letter and her eventual termination would require some additional showing.  See Alexander v. Ohio State Univ. College of Soc. Work, 429 F. App'x 481, 490 (6th Cir. 2011) ("This court has held than an inference of retaliation may be established based on temporal proximity of two or three months."); Cooper v. City of N. Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986) (finding that the mere fact that employee was discharged four months after filing a discrimination claim was insufficient to support an inference of retaliation); but see Flones v. Beaumont Health Sys., 567 F. App'x 399, 408 (6th Cir. 2014) (finding that, where plaintiff had adduced "scant evidence" to establish a causal connection between protected activity and discharge, temporal proximity of less than two months "is insufficient to support a prima facie inference of causation").

If the Court were to consider only the first letter protected activity, Whiteaker would need to show something else to establish that her letter was the "but-for" cause of her termination, which she cannot do. The evidence clearly demonstrates that Whiteaker's performance would have led to her termination regardless of whether she sent the letters. Even taking the facts in Whiteaker's favor and concluding that she received only a verbal warning from Mehta in June 2014, prior to receiving the final written warning from Subran-Marsh in September 2014, Whiteaker would have progressed through two of the four disciplinary steps <u>before</u> sending the first letter alleging age discrimination, and her performance only decreased after September 2014. Whiteaker would therefore fail to meet her burden as to causation. <u>See</u> <u>Beard</u>, 593 F. App'x at 451 ("Beard's termination appears only to be the natural progression of Auto Club's preexisting concerns . . .").

Assuming, however, that the second letter constitutes protected activity and that Whiteaker was thus able to put forth a prima facie case,[15] the burden would then fall to Bank of America to show a legitimate, nondiscriminatory reason for its actions. <u>Ford v. General Motors</u>, 305 F.3d 545, 553 (6th Cir. 2002). Whiteaker, "who bears the burden of persuasion throughout the entire process, must then demonstrate that [Bank of America's] proffered reason was false." <u>Id.</u> The analysis here follows the analysis discussed above with respect to the age discrimination, and the Court would reach the same conclusion here, as well. <u>See</u> <u>Parries v. Makino, Inc.</u>, 148 F. App'x 291, 302 (6th Cir. 2005) (concluding that summary judgment on a retaliation claim was appropriate where the court "already held in conjunction with the plaintiff's discrimination claims that there

---

[15] The Court would nonetheless find that Whiteaker cannot establish a prima facie case for her ELCRA claim, where "the standard for causation is higher." <u>Mickey</u>, 516 F.3d at 523 n. 2. Whiteaker must show that her allegations of age discrimination were a "significant factor" in Bank of America's decision to terminate her, "not just that there was a causal link between the two." <u>Id.</u> She cannot meet this standard with regard to either protected activity.

was insufficient evidence to establish pretext[] [and plaintiff] presented no additional evidence to indicate that the employer was engaging in pretext in terms of the retaliation claim").  Whiteaker has offered no evidence to show that her termination was retaliation for her allegations of age discrimination, rather than her poor performance.

Accordingly, summary judgment is appropriate with respect to her retaliation claims under both the ADEA and ELCRA.

## IV. CONCLUSION

For the reasons provided, Defendant Bank of America's motion for summary judgment (Dkt. 23) is granted.

SO ORDERED.

Dated:  March 8, 2018                      s/Mark A. Goldsmith
     Detroit, Michigan                      MARK A. GOLDSMITH
                                            United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 8, 2018.

                                       s/Karri Sandusky
                                              Case Manager